UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
01 NOV 30 AM 11: 08
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| THE SOUTHWESTERN ATHLETIC CONFERENCE, INC., ) ) ) Plaintiff, ) ) vs. ) ) JOHN DOES 1-100; JANE DOES 1-100; ) and XYZ COMPANIES 1-100, ) ) Defendants. ) | Civil Action No. CV-01-S-3027-S |

ENTERED
NOV 30 2001

## MEMORANDUM OPINION

This action is before the court on the motion of plaintiff, the Southwestern Athletic Conference, Inc. ("SWAC"), seeking a temporary restraining order, order of seizure, and preliminary injunction to prevent as yet unnamed defendants from selling imitation SWAC merchandise at the December 1, 2001 conference championship football game in Birmingham, Alabama. Upon consideration of the pleadings, brief, evidence, and oral argument, this court concludes the motion is due to be denied and the action dismissed.

### I. STATEMENT OF FACTS

The Grambling State University football team will meet the Alabama State University team on Legion Field in Birmingham, Alabama at 1:00 p.m. on December 1, 2001, to compete for the SWAC Championship. If plaintiff has its way, fans will witness not only a bruising battle on the field, but also a similar showdown on the streets surrounding the stadium. This is because plaintiff would have this court order United States Marshals, Birmingham police officers, Jefferson County Deputy Sheriffs, and a deputized contingent of *"counsel for the SWAC, SWAC representatives, and*



*persons acting under their supervision*,"[1] to seize and impound from vendors stationed outside the stadium "any products bearing the [unlicensed] name, trademark, or likeness of the SWAC, SWAC sponsored championship events, or any colorable variation thereof."[2]

Plaintiff seeks an *ex parte* temporary restraining order on the sale or attempted sale of any unauthorized merchandise containing plaintiff's trademark.[3] Plaintiff contends that it has the exclusive right to sell merchandise that bears "SWAC's name, image, and logos."[4] SWAC licenses these rights to merchants willing to pay an annual fee in the amount of $750. To date, however, only four vendors have paid that fee and been properly licensed to sell SWAC merchandise.[5] SWAC contends that "each bootleg sale [is] irretrievably lost to SWAC," and inflicts damage on plaintiff's corporate good will "through the distribution of inferior merchandise [that] cannot be calculated or remedied."[6]

Plaintiff is seeking injunctive relief in anticipation of this year's SWAC championship as a direct result of its knowledge of past trademark infringement by unauthorized vendors at SWAC events. According to E. Delane Rosemond, SWAC General Counsel and Associate Commissioner, "vendors have traveled the country following historically black college and university football games because of the lucrative merchandise market. Vendors have infiltrated the SWAC championship

---

[1] Motion for Temporary Restraining Order at unnumbered page 2 (emphasis supplied).

[2] Complaint at 6 (Prayer for Relief ¶ 1(a)).

[3] SWAC General Counsel and Associate Commissioner E. Delane Rosemond clarified for the court at the November 29, 2001 hearing on plaintiff's motion that the SWAC's trademarks, which include the name of the conference, the acronym "SWAC," a star-shaped logo used on printed materials, and the SWAC conference championship game logo, are not registered with the Patent and Trademark Office in Washington, D.C. Rosemond testified that the marks are registered in the State of Louisiana, however.

[4] Memorandum of Law in Support at 2.

[5] Complaint (Declaration of E. Delane Rosemond), ¶¶ 10-11.

[6] Memorandum of Law in Support at 2.

2

football game and have been unlawfully using the SWAC's marks to sell merchandise at the expense of SWAC."[7] Rosemond declared in an affidavit submitted to the court in conjunction with plaintiff's request for *ex parte* injunctive relief that:

> I was in attendance at the inaugural SWAC championship football game on December 8, 1999. I witnessed many unlicenced [sic] vendors selling items, including but not limited to T-shirts, sweatshirts, hats, posters and signs unlawfully displaying trademarks of the SWAC including its name and logo. These vendors sold a large amount of merchandise to the public without the right to do so.
>
> At that time, I requested that local law enforcement (Birmingham Police Department) seize the illegal merchandise. However, the police refused, stating that they would not act merely upon my authorization and my word that the merchandise was being sold illegally.
>
> During that game, I talked with several vendors about their illegal merchandise and succeeded in having some vendors to give up the merchandise they had on display. However, the vendors had hidden other merchandise that was eventually sold at the expense of the SWAC.
>
> Again at the year 2000 SWAC Championship Football game a number of vendors were surreptitiously selling merchandise bearing the SWAC's marks.[8]

SWAC filed its emergency motion for a temporary restraining order, order of seizure, and for preliminary injunction on November 28, 2001 at 9:25 a.m. The motion was filed in an effort to prevent any vendors (all of whom are unnamed in this action) from selling the unlicensed merchandise at issue three days later, on Saturday, December 1, 2001, at Legion Field in Birmingham, Alabama. Plaintiff also seeks to extend its reach beyond the environs of Legion Field, and has requested that this court grant a "nationwide preliminary injunction" that would "enjoin all

---

[7] Complaint (Declaration of E. Delane Rosemond), ¶ 4.

[8] *Id.* ¶ 5-8. Rosemond gave testimony at the November 29, 2001 hearing on plaintiff's motion that clarified this statement. Rosemond merely asked local police at the 1999 SWAC conference championship what he could do to stop the unauthorized vendors from selling SWAC merchandise, to which police responded that it was his "problem" to handle. On December 7, 2000, however, Rosemond again sought police assistance, but also tried to get them to seize the unauthorized vendors' merchandise.

3

of defendants' activities during the championship weekend."[9]

## II. DISCUSSION

As a preliminary matter, this court does not understand why plaintiff has waited until the eleventh hour to file its motion for injunctive relief. Plaintiff knew of the championship game's location long before the morning of November 28, 2001. SWAC's General Counsel and Associate Commissioner, E. Delane Rosemond, testified at the November 29, 2001 hearing on plaintiff's motion that SWAC has had a contract with the City of Birmingham since 1999 to play the SWAC conference championship game at Legion Field.[10] The result of filing this action just three days and some hours prior to the 1:00 p.m. kickoff is that plaintiff has "creat[ed] an artificial air of emergency." *Plant v. Does*, 19 F. Supp. 2d 1316, 1317 (S.D. Fla. 1998).

The last minute filing is further puzzling in light of the fact that plaintiff admittedly had notice of the alleged trademark infringement fully two years ago, when SWAC's General Counsel and Associate Commissioner first witnessed, and attempted to prevent, sales of the contested merchandise at the conference championship game played on December 8, 1999, in the same city, on the same field. The SWAC obtained confirmation of the offending practice the following year at the 2000 championship game, also played on Legion Field, in Birmingham, Alabama, when Rosemond again witnessed unauthorized sales. This court therefore echoes the words of another federal district judge, written in the context of an action seeking similar injunctive relief against vendors selling unauthorized merchandise:

> I am somewhat disturbed about the timing of plaintiff's request. The suit was filed on December 1, and the concert is scheduled for December 7. *The short time*

---

[9] Memorandum of Law at 10.

[10] The original contract was to run through 2003, and has since been extended through 2005.

> *between the two events contributed to an aura of emergency to this proceeding that should not have been necessary* .... The [musical group] and its souvenir hawkers knew they were going to be here over two months ago. The could have filed their lawsuit at that time and requested an orderly placement on the calendar a week or two in advance of the concert date.

*Brockum International, Inc. v. Various John Does*, 551 F. Supp. 1054, 1055 (E.D. Wis. 1982).

Also troubling is the fact that plaintiff has not been entirely forthcoming with the court in its submission of decisions by other courts that allegedly have considered similar requests for injunctive relief against unnamed and unknown defendants. Plaintiff has submitted, in two appendices, a list of fifty decisions by other federal courts that, according to plaintiff, "have repeatedly issued temporary restraining orders and orders of seizure [against unnamed defendants], in advance of events, to stop the sale of bootleg merchandise."[11] The problem with that list of authorities lies in the fact that all of the decisions appear to be unpublished, and thus inaccessible to the court. Moreover, plaintiff did not submit copies of the unreported decisions, or explanations as to the facts and relevance of each cited case. More importantly, however, plaintiff's counsel did not disclose in its brief any *adverse* decisions in which courts have *denied* similar claims for injunctive relief. When counsel was asked for adverse authority at the November 29, 2001 hearing on plaintiff's motion, he offered only one case that denied plaintiffs injunctive relief on similar facts: *i.e., Plant v. Does*, 19 F. Supp. 2d 1316 (S.D. Fla. 1998).

In contrast, this court found six cases in which federal courts denied a plaintiff's request for *ex parte* injunctive relief against unnamed, unauthorized merchandisers at events like the one at issue here. *See Plant v. Does, supra; Brockum Co. v. Various John Does*, 685 F. Supp. 476 (E.D. Pa. 1988); *National Football League v. Coniglio*, 554 F. Supp. 1224 (D. D.C. 1983); *Showtime*

---

[11] *Id.* at 7; *see also* Appendix A and B to Memorandum of Law.

*Marketing, Inc. v. Doe*, 95 F.R.D. 355 (N.D. Ill. 1982); *Winterland Concessions v. Geisel*, 511 F. Supp. 310 (N.D. Ill. 1981); *Rock Tours, Ltd. v. Does*, 507 F. Supp. 63 (N.D. Ala. 1981). One of these decisions, *Rock Tours, Ltd. v. Does*, *supra*, was entered by the Chief Judge of this court, the Honorable U.W. Clemon.

The importance of this omission should not be lost on plaintiff's counsel. As officers of this court, counsel have an unequivocal duty to disclose adverse authority. *See, e.g., Plant*, 19 F. Supp. 2d at 1319 (citing *Mallard v. U.S. District Court for the Southern District of Iowa*, 490 U.S. 296, 310, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989) (Stevens, J., dissenting)); *Brockum Co.*, 685 F. Supp. at 478; *see also, e.g.,* Model Rules of Professional Conduct Rule 3.3 (1983) (stating in Model Rule titled "Candor Toward the Tribunal," "(a) A lawyer shall not knowingly: ... (3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel ...."). This duty is heightened in *ex parte* proceedings, where no defendant is present to rebut a plaintiff's argument with contrary authority. *See Brockum Co.*, 685 F. Supp. at 478 (stating that, particularly in an *ex parte* proceeding, "counsel must be vigilant in discharging their duties as officers of the court, including articulating correct statements of the law, *disclosing adverse authority*, and avoiding a misuse of court orders") (emphasis supplied).

That said, this court turns to the merits of the motion before it, and considers whether it has the authority to — much less whether it should — grant plaintiff's motion to order U.S. Marshals, local law enforcement officials, and a deputized contingent of *plaintiff's representatives* to seize property belonging to unknown and unnamed defendants, merely because plaintiff alleges that *some* of the unknown defendants *might* infringe plaintiff's trademarks and, thus, engage in a violation of

the Lanham Act, 15 U.S.C. § 1116. This court finds that it has no such authority.

**A.  Justiciability and Jurisdiction**

Fundamentally, before this court can even contemplate granting the relief requested here, plaintiff must establish that the court has jurisdiction over the parties, and, that the case is justiciable. Plaintiff has not shouldered those burdens.

First, it is not clear that this court has personal jurisdiction over the unidentified defendants. While plaintiff is permitted to use fictitious names for defendants, "federal courts do not favor the naming of 'John Doe' defendants." *Joel v. John Does*, 499 F. Supp. 791, 792 (E.D. Wis. 1980) (relying on *Fifty Associates v. Prudential Insurance Co.*, 446 F.2d 1187 (9th Cir. 1970); *United States ex rel. Lee v. Illinois*, 343 F.2d 120 (7th Cir. 1965)); *see also Plant*, 19 F. Supp. 2d at 1319. This court is particularly uncomfortable with the use of fictitious defendants here; plaintiff does not intend to use traditional discovery methods to ascertain the identities of the unnamed defendants, *see Plant*, 19 F. Supp. 2d at 1320, but instead plans to search for possible bootleggers among the group of vendors who, they anticipate, may gather at the December 1, 2001 SWAC championship game. "Fictitious name pleading is permitted, but only if real persons are seeking refuge behind the protection of the assumed names." 13 Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3530, at 309 (2d ed. 1984). This court finds persuasive the cautionary instruction of another court within this Circuit: "The use of a fictitious name is not generally permitted as a tool by which a private plaintiff may obtain a broad-based order preventing any and all members of society from engaging in future behavior that might or might not later be found to have violated plaintiff's rights." *Plant*, 19 F. Supp. 2d at 1320.

Plaintiff suggests that this court will have personal jurisdiction over defendants once plaintiff

is able to find, and serve, offending persons at the SWAC event on December 1, 2001.[12] *See* Fed. R. Civ. P. 4(e). At least two other federal district courts have granted temporary restraining orders in cases wherein the original, unnamed defendants were unknown, but permitted plaintiffs to effect service of process at events sponsored by the plaintiffs. *See Brockum International*, 551 F. Supp. at 1055; *Joel*, 499 F. Supp. at 792.

This court declines to follow the lead of those courts. In order for this court to have jurisdiction over the unnamed persons, such defendants must, at least, have been accorded constructive notice of an action against them. This court, pursuant to instruction of the Supreme Court in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950),

> must balance the individual interest sought to be protected by the Fourteenth Amendment. This is defined by our holding that "The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363. This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.

*Id.* at 314, 70 S.Ct. at 658. As a result, in the case of unnamed or unknown defendants, a plaintiff must "demonstrate[] that they have engaged in a reasonably diligent search to identify the unknown defendants [and] ... inform the Court of any efforts they have taken to provide these individuals with constructive notice." *Plant*, 19 F. Supp. 2d at 1320 (quoting *Boyd v. Arizona State Board of Dental Examiners*, No. Civ. A. 88-1560-MA, 1989 WL 37309, at *12 (D. Mass. Apr. 4, 1989)). This, plaintiff has failed to do.

As previously noted, plaintiff has had actual notice of the possibility of infringing sales of

---

[12] *See* Complaint ¶ 4.

8

merchandise for nearly two years. Plaintiff was aware that such conduct is likely to reoccur at this year's championship game in Birmingham, Alabama, because the 1999 and 2000 conference championship games also were played in Birmingham, at the same stadium. Further, plaintiff claims that these "bootleg" vendors have an historical practice of "travel[ing] the country following historically black university football games because of the lucrative merchandise market," and that these "[v]endors have infiltrated the SWAC championship football game and have been unlawfully using the SWAC's marks to sell merchandise at the expense of the SWAC."[13]

Despite these facts, plaintiff has offered no specific evidence of its efforts to identify any of the offending vendors. In fact, plaintiff's counsel stated at the court's November 29, 2001 hearing that SWAC had made no efforts whatsoever to give these defendants notice. This was the case even though plaintiff ostensibly could have ascertained the identities of past "bootleggers" from vendor permit records maintained by the City of Birmingham.[14] Plaintiff *does* offer the affidavit of its General Counsel and Associate Commissioner, however, who approached vendors at the 1999 and 2000 SWAC championship games in Birmingham to encourage them to quit their allegedly unauthorized sales.[15] This is of little import to the question of defendants' notice here, however, as this action was not filed until November 28, 2001. Even if some (or all) of the allegedly unauthorized vendors expected to appear at the 2001 SWAC conference championship are the *same* vendors plaintiff's General Counsel and Associate Commissioner approached in 1999 and 2000 (which plaintiff has not demonstrated), those potential defendants could not possibly have been put

---

[13] Complaint, Declaration of E. Delane Rosemond, ¶ 4.

[14] Plaintiff's General Counsel testified at the November 29, 2001 hearing on plaintiff's motion that each of the unauthorized vendors at past SWAC championship games had obtained temporary permits from the City of Birmingham to sell merchandise on the public streets surrounding Legion Field.

[15] Complaint, Declaration of E. Delane Rosemond, ¶ 5.

9

on constructive notice of claims that would not be filed against them until nearly one or (with regard to some defendants) two years later.

This court also is concerned about the justiciability of the case before it. Article III of the federal Constitution limits this court's jurisdiction to "case[s]" or "controvers[ies]." As the Supreme Court has written:

> [T]he judicial power of federal courts is constitutionally restricted to "cases" and "controversies." As is so often the situation in constitutional adjudication, those two words have an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government. Embodied in the words "cases" and "controversies" are two complementary but somewhat different limitations. *In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.* And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine.

*Flast v. Cohen*, 392 U.S. 83, 94-95, 88 S.Ct. 1942, 1949-50, 20 L.Ed.2d (1968) (emphasis supplied); *see also Graham v. Butterworth*, 5 F.3d 496, 498-99 (11th Cir. 1993) ("Article III of the United States Constitution requires that federal courts address only 'cases and controversies.' Justiciability ... seeks to ensure that federal courts address only questions presented in an adversarial context and that the judiciary will not encroach upon the powers of other branches of government.") (quoting *Flast*, 392 U.S. at 95, 88 S.Ct. at 1949-50) (citations omitted).

Plaintiff has no definitive adversaries at present, and the proceedings here have been entirely *ex parte*. There is thus an absence of any challenge whatsoever to plaintiff's action, and a significant question as to whether there exists a "'sufficient adversary interest to stimulate the parties to a full presentation of the facts and arguments,' which in our adversary system is available only from the

10

parties." *Rock Tours, Ltd.*, 507 F. Supp. at 66 (quoting 13 Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3530, at 308 (2d ed. 1984)); *see also Geisel*, 511 F. Supp. at 312 (denying a temporary restraining order and order of seizure to plaintiffs absent the designation of specific defendants, but later granting relief once plaintiffs identified specific defendants). In the absence of specific, identifiable defendants to this action, therefore, plaintiff's case is nonjusticiable, because there is no "case" or "controversy" before this court within the meaning of Article III to the Constitution. *See Flast*, 392 U.S. at 94-97, 88 S.Ct. at 1949-51; *see also Plant*, 19 F. Supp. 2d at 1321; *Showtime Marketing, Inc. v. Doe*, 95 F.R.D. 355, 356 (N.D. Ill. 1982); *Geisel*, 511 F. Supp. at 311; *Rock Tours, Ltd.*, 507 F. Supp. at 65-66.

In addition, justiciability concerns arise from the fact that it is not clear whether plaintiff has standing to be heard by this court. The Supreme Court has written extensively on this principle of justiciability. For example, in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the Court explained:

> In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. *As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal- court jurisdiction and to justify exercise of the court's remedial powers on his behalf.* The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. *A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action ...."*

*Id.*, 95 S.Ct. at 2205 (citations omitted) (emphasis supplied). The Court further elucidated the requirements for Article III standing in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130,

11

119 L.Ed.2d 351 (1992), saying:

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact — *an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"* Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* at 560-61, 112 S.Ct. at 2136 (citations omitted). "By particularized," the Court wrote, "we mean that the injury must affect the plaintiff in a personal and individual way." *Id.* at 560 n.1, 112 S.Ct. at 2136 n.1.

Plaintiff argues that it has been injured in the past to the extent of lost profits; specifically, unauthorized vendors present at the 1999 and 2000 SWAC championship games either purchased merchandise from authorized vendors and resold it, or produced their own merchandise to sell without being licensed by the SWAC.[16] In either event, these unauthorized vendors failed to pay the SWAC its $750 annual licensing fee, thus obtaining plaintiff's permission to make those sales. Plaintiff appears to claim that it has standing as a consequence of such practices, because it has suffered past injuries at the hands of unauthorized merchandise dealers. Because plaintiff has not shown this court that the vendors who caused plaintiff's past injuries are the same as the John and Jane Does named as defendants here, however, this argument has no merit. In fact, plaintiff's

---

[16] Plaintiff claims that, without the injunctive relief prayed for here, plaintiff will suffer "injury and monetary loss." Complaint ¶ 26. SWAC General Counsel and Associate Commissioner E. Delane Rosemond discussed the expected monetary loss at the court's November 29, 2001 hearing on this matter. According to Rosemond, SWAC does not receive a share of the merchandise sale profits earned by its authorized vendors. Further, the SWAC does not intend to have its own booth at the 2001 championship game from which it will sell merchandise it has produced. As a result, the expected monetary injury comes from the failure of unauthorized vendors (whom SWAC expects to be present at the 2001 championship game) to pay the $750 annual licensing fee.

complaint is based on expected, future injury, rather than on the commission of past acts by defendants named here.[17] It is problematic, then, that these unnamed, unknown defendants have not yet committed an injurious act against plaintiff, and that there has been no invasion of plaintiff's legally protected interest. Further, while plaintiff may suffer imminent injury at the hands of these defendants, in light of the fact that the SWAC conference championship was scheduled to begin a mere three days from the date on which plaintiff filed its motion, neither plaintiff nor this court is able to determine *who* poses this imminent threat. As such, it appears that plaintiff does not have standing to be heard by this court.

**B.     Standards for Entry of a Preliminary Injunction or Temporary Restraining Order**

Assuming *arguendo* that this case is justiciable, and that this court has personal jurisdiction over the unidentified defendants, plaintiff has nevertheless failed to demonstrate that it is entitled to the emergency injunctive relief it requests. To justify the entry of a temporary restraining order or preliminary injunction, plaintiff must satisfy four prerequisites: (1) demonstrate a substantial likelihood of ultimately prevailing on the merits; (2) show it will suffer irreparable harm if an injunction maintaining the status quo *pendente lite* does not issue; (3) prove that the threatened injury to plaintiff outweighs whatever damage the proposed injunction may cause the opposing parties; and (4) demonstrate that the injunction will not be adverse to the public interest. *See, e.g., McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Northeastern Florida Chapter of the Association of General Contractors of America v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). *See generally* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2948, at 131-33 (2d ed. 1995). Each of these

---

[17] *See, e.g.,* Complaint ¶ 4.

factors is discussed in the following sections.

### 1. Likelihood of success on the merits

The requirement that a party seeking temporary or preliminary injunctive relief demonstrate a substantial likelihood of ultimately prevailing on the merits does not mean that the moving party must show that it is certain to succeed on the merits. *See Johnson v. United States Department of Agriculture*, 734 F.2d 774, 782 (11th Cir. 1984); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *supra* § 2948.3, at 188 & n.5. Rather, the movant simply must show a substantial "likelihood" of success, in light of the underlying rationale of both temporary restraining orders and preliminary injunctions:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, ... and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*University of Texas v. Camenisch*, 451 U.S. 390, 394, 101 S.Ct. 1830, 1833, 68 L.Ed.2d 175 (1981).

Plaintiff has failed to demonstrate a clear probability of success on the merits. Plaintiff engages in a thorough discussion of the trademark protections afforded it by section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[18] Section 43(a) of the Lanham Act provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which —

---

[18] Although outside the scope of this court's analysis, the Supreme Court has held that Section 43(a) of the Lanham Act protects qualifying unregistered trademarks. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-68, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992).

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

25 U.S.C. § 1125(a) (1994). Plaintiff asserts that at least fifty federal courts have held that "bootleg" merchandise violates section 43(a) of the Lanham Act.[19] Nevertheless, plaintiff has failed to demonstrate that it is likely to prevail on its Lanham Act claim with respect to merchandise it has yet to seize from defendants it has yet to name or identify. Plaintiff further cannot demonstrate that it is likely to succeed on the merits with respect to *authorized* merchandise that could be seized as part of this vigilante operation. *See, e.g, Coniglio*, 554 F. Supp. at 1226.

**2.     Irreparable harm**

Some cases have described a showing of "irreparable harm" as "the *sine qua non* of injunctive relief." *Northeastern Florida Chapter of the Association of General Contractors of America v. City of Jacksonville, Florida*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir. 1978)).

> The injury must be neither remote nor speculative, but actual and imminent. ... An injury is "irreparable" only if it cannot be undone through monetary remedies. The key word in this consideration is irreparable. *Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm. ...*

---

[19] *Id.* at 3; *see also supra* text accompanying note 11.

15

*Id.* at 1285 (citations and internal quotation marks omitted) (emphasis supplied).

Plaintiff has not offered specific evidence of any irreparable harm that would result from this court's denial of a temporary restraining order, seizure order, or preliminary injunction. This is because plaintiff has failed to demonstrate that the temporary restraining order or preliminary injunction is the only way to prevent the anticipated harm stemming from allegedly illicit merchandise sales.

Plaintiff contends that the likelihood of confusion from defendants' alleged trademark infringement and unfair competition constitutes irreparable harm warranting temporary and preliminary injunctive relief.[20] For support, plaintiff cites *Matter of Vuitton et Fils, S.A.*, 606 F.2d 1, 4-5 (2d Cir. 1979). The Second Circuit in *Vuitton et Fils* wrote:

> The ex parte temporary restraining order is indispensable to the commencement of an action *when it is the sole method of preserving a state of affairs in which the court can provide effective final relief.* Immediate action is vital when imminent destruction of the disputed property, its removal beyond the confines of the state, or its sale to an innocent third party is threatened. In these situations, giving the defendant notice of the application for an injunction could result in an inability to provide any relief at all.

*Id.* at 4 (citations and footnote omitted) (emphasis supplied). *Vuitton et Fils* is distinguishable from the case at bar, however. The Second Circuit found that allegedly counterfeit merchandise was nearly identical to the goods on which the plaintiff there held a registered trademark. *Id.* at 4. The plaintiff in *Vuitton et Fils* also convinced the Second Circuit that notice to the defendants of temporary restraining orders and injunctions had, based on its experience in eighty-four lawsuits and hundreds of investigations, prevented prosecution of the trademark infringement, because defendants would dispose of the merchandise by transferring it to other vendors. *Id.*

---

[20] Memorandum of Law at 7.

Plaintiff here has not shown that defendants have taken similarly evasive action; instead, plaintiff asserts that these vendors "historically" and routinely follow SWAC events around the country marketing their wares, and that they have continued to sell their merchandise even after SWAC officials confiscated some of the merchandise.[21] Further, plaintiff has other avenues of relief available to it. For example, plaintiff could initiate an investigation of defendants' activities, and later sue defendants for any lost profits. *See Coniglio*, 554 F. Supp. at 1226.

### 3. Balancing the harm and serving the public interest

The focus at this stage of analysis is on the harm that may occur between the issuance of an injunction and a final hearing on the merits, *see United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983), and whether the injunctive relief is adverse to the public interest. Plaintiff contends (in a footnote to its brief) that defendants will suffer no harm, because the "proposed order only authorizes the seizure of merchandise that violates the trademark laws."[22] Further, plaintiff asserts that the temporary restraining order, seizure order, and preliminary injunction are "the only method[s] of protecting the public from inferior merchandise, including the infringing merchandise, which bear a false designation of origin."[23]

In fact, plaintiff has offered no concrete evidence to show that the merchandise sold by these vendors either will be inferior or an infringement of plaintiff's trademark — or that it was so at the 1999 and 2000 championship games. As a result, the harm to defendants here is potentially vast: this court can imagine U.S. Marshals, local law enforcement, and SWAC staff members seizing, in error, legitimate and authorized merchandise, causing small business owners and street vendors great

---

[21] Complaint, Declaration of E. Delane Rosemond, at 2.
[22] Memorandum of Law at 7 n.1.
[23] *Id.* at 2.

expense, and potentially causing deprivations of due process and years of compensatory litigation. *See Coniglio*, 554 F. Supp. at 1226. In addition, the proposed seizures could cause physical unrest in a crowded setting, disrupting an already overburdened law enforcement community. Both considerations appear contrary to the public interest, and likely to cause harm to defendants, whoever they may be.

### III. CONCLUSION

This court accordingly finds that plaintiff's motion for a temporary restraining order, order of seizure, and preliminary injunction is due to be denied. The court further concludes the action is due to be dismissed for plaintiff's failure to demonstrate jurisdiction or justiciability. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this __30th__ day of November, 2001.

_____
United States District Judge